# In The United States Court of Federal Claims

No. 01-538L

(Filed: September 13, 2005)

**This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Body of Law.**

| | |
|---|---|
| KENT D. FLORO, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

**OPINION**

**ALLEGRA, Judge:**

This takings case, in which a marina owner seeks compensation stemming, in part, from the alleged deposit of military ordnance on and near his property, is before the court on defendant's motion for summary judgment. After careful consideration of the briefs filed by the parties, and for the reasons that follow, the court **GRANTS**, **in part**, and **DENIES**, **in part**, defendant's motion for summary judgment.

## I. FACTS

Briefly, the salient facts in this case are as follows:

Plaintiff, Kent. D. Floro, owns a parcel of land on the shores of the Toussaint River in Lacarne, Ohio. Plaintiff and his family have operated Floro's Marina and Campgrounds on that property since about 1973. The marina sits between 1 and 1.5 miles upstream from the river mouth, and is the furthest upstream of the several marinas in that vicinity.

Floro's Marina and Campgrounds lies in close proximity to the Davis-Besse Nuclear Power Plant, the owner and operator of which received a permit from the Army Corps of Engineers (Corps) to build a revetment/retaining wall on the shores of Lake Erie. That permit was issued in 1987 and the revetment wall subsequently was built following a period for public comment. Plaintiff opposed the construction of the revetment on the grounds that it would

contribute to additional sand deposition in the river mouth, impairing navigation. The Corps responded to plaintiff's concerns by reviewing the revetment proposal and concluding that the discharge from the proposed construction would have only a short-term impact on the sedimentation process. Around the time of this permitting process, plaintiff and other local residents requested that the Corps conduct dredging at the Toussaint River mouth in order to counteract sand accretion and ensure its continued navigability. The Corps conducted dredging operations in the river mouth area on five occasions, in 1991, 1995, 1999, 2001, and 2004. No dredging occurred upstream from the mouth of the lake.

Several of those dredging operations turned up unexploded ordnance from a nearby Army proving ground. In 1992, the Corps conducted ordnance removal actions along the shoreline of Lake Erie and removed 5,000 pieces of ordnance. Operations in 1995 and 2002 also yielded ordnance in the river mouth area; operations in 1999, 2001, and 2004, located no ordnance. In 1993, the Corps conducted a "field study" near the river mouth for the purpose of documenting geological conditions, coastal processes, and ordnance distribution patterns. Several of the vessels engaged in the study were berthed at plaintiff's marina, and during the study inert ordnance was placed into the waters of plaintiff's marina in order to calibrate the Corps's magnetometer equipment. The parties dispute whether all such ordnance was removed.

On July 24, 2000, plaintiff filed a claim with the Army under the Federal Tort Claims Act (FTCA), alleging that Corps activities – primarily, the granting of permission to build the revetment wall – caused the flow of water in the Toussaint River to be altered, resulting in a build-up of sand and silt at the mouth of the river that both greatly reduced its navigability, and, by lowering the water level in the mouth area, exposed live ordnance that made boating in the area unsafe. Plaintiff claimed $3,540,000 for "loss of livelihood, loss of property value," and the destruction of his business. The Army's Claims Service denied his claim on April 18, 2001, stating that plaintiff had "provided no evidence that shows [his] failing business was caused by Government negligence," as required to sustain an action under the FTCA. The Claims Service also concluded that plaintiff's claim accrued in 1991 and was, therefore, barred by the statute of limitations. *See* 28 U.S.C. § 2401. Finally, the Claims Service noted that "there is no evidence that live ordnance migrated into the Toussaint River." On June 8, 2001, plaintiff appealed, disputing the Army's conclusions about causation, the statute of limitations, and the presence of ordnance in the river. On September 28, 2001, the Army denied plaintiff's appeal.

On September 24, 2001, plaintiff filed a complaint in this court asserting a takings claim and a due process claim. Plaintiff seeks $3,540,000, plus fees and costs. Defendant's answer, filed January 25, 2002, lists three affirmative defenses: failure to state a claim upon which relief can be granted, statute of limitations and lack of jurisdiction over the due process claim. Following discovery, on June 22, 2004, defendant filed a motion for summary judgment. After briefing was stayed to deal with various matters, including expert witnesses, on September 20, 2004, plaintiff filed his response to defendant's motion for summary judgment. On December 8, 2004, defendant filed its reply to plaintiff's opposition. On February 2, 2005, and March 10, 2005, the court denied two motions *in limine* previously filed by defendant to exclude certain of plaintiff's evidence of damages.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho. Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)).

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As explained by the Supreme Court, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enterprises v. Apfel*, 524 U.S. 498, 522 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

Plaintiff alleges that various actions of the government effectuated a takings of his property, including: (i) the approval, by the Corps of Engineers, of the building of a dike and revetment at the mouth of the Toussaint River, "alter[ing] the natural flow" of the river and rendering it "practically unnavigable;" (ii) "the firing of live ammunition into Lake Erie," depositing unexploded ordnance into the mouth of the river either directly or by "migration," rendering navigation of the river "dangerous;" and (iii) the actual dumping of ordnance on plaintiff's property or "migration" of ordnance dumped elsewhere onto plaintiff's property. Plaintiff characterizes the first two actions as regulatory takings, and the latter as a physical taking, all of which, according to plaintiff, have diminished significantly the value of his property and denied him economically viable use of his land. Defendant remonstrates that plaintiff's claims are time-barred, that some of the alleged actions are torts over which this court lacks jurisdiction, and that the majority of plaintiff's claims are based upon property interests that he did not possess. The court will consider these issues *seriatim*.

**A. Statute of Limitations**.

Takings claims in this court must be filed "within six years after such claim first accrues." 28 U.S.C. § 2501. A claim "accrues," for this purpose, when "all events necessary to fix the liability of the defendant have occurred," *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993), and "the plaintiff was or should have been aware of their existence," *Hopeland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). Plaintiff bears the burden of establishing that its claim was filed timely within the period prescribed by the statute of limitations. *See McNutt v. General Motors Acceptance Corp. of Ind*., 298 U.S. 178, 189 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1376-77 (Fed. Cir. 1998).

Two years ago, the Federal Circuit expounded its view of how the statute of limitations applies to cases involving gradual property loss, stating "the proper test [is] when sufficient inroads into the property had occurred so that the permanent nature of the taking was evident and the extent of the damage foreseeable." *Hair v. United States*, 350 F.3d 1253, 1259 (Fed. Cir. 2003) (citing *Boling v. United States*, 220 F.3d 1365 (Fed. Cir. 2000)). The Federal Circuit has likewise acknowledged that "in cases where the government leaves the taking of property to a gradual physical process . . . determining the exact moment of claim accrual is difficult." *Boling*, 220 F.3d at 1370. The Supreme Court has stated that, in such circumstances, the "accrual of the claim [is] delayed until the situation [has] 'stabilized' such that the 'consequences of the inundation have so manifested themselves that a final account may be struck.'" *Id*. (quoting *United States v. Dickinson*, 331 U.S. 745, 749 (1947)). "Stabilization," for this purpose, "occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking." *Boling*, 220 F.3d at 1370.

In the case *sub judice*, defendant argues that plaintiff knew about the sand buildup at the mouth of the Toussaint, and its effect on river navigation, well before six years before the filing of his complaint on September 24, 2001. Plaintiff concedes that he knew "that the revetments had caused shoaling at the mouth of the river, and that there was ordnance in and near the river," but he argues that this knowledge "gave him no cause to know that a permanent taking had occurred, because . . . the Army Corps of Engineers not only told [p]laintiff and others that there were going to remediate the situation, [but] actually undertook remediation efforts, which continue to this day." Stressing the latter point, plaintiff relies upon *Banks v. United States*, 314 F.3d 1304 (Fed. Cir.), *cert. denied*, 540 U.S. 985 (2003), which involved the impact of mitigation efforts on the timing of the accrual of a takings claim.

In *Banks*, *supra*, the property owners sued for a takings of their property due to gradual erosion of shoreline, as significantly exacerbated due to jetties constructed by the Army Corps of Engineers. The Corps had unsuccessfully attempted to mitigate this erosion by nourishing the shoreline with various materials. Because the owners knew about the erosion problem more than six years before the filing of their suit, this court dismissed their case for lack of jurisdiction. The Federal Circuit reversed. Applying the stabilization doctrine enunciated in *Dickinson*, *supra*, and relying on its opinion in *Applegate v. United States*, 25 F.3d 1579 (Fed. Cir. 1994), *cert. denied*, 540 U.S. 1147 (2004), the court declared that the rule for determining whether the statute

of limitations was tolled was whether the permanence and predictability of the extent of damage to the beachfront in question "was made justifiably uncertain by the Corps' mitigation efforts." *Banks*, 314 F.3d at 1309. It found that the plaintiffs were justifiably uncertain as to the permanency of the taking because of the Corps' mitigation efforts, thereby delaying the accrual of the plaintiffs' claim until it became clear that the erosion problem was not going to be remedied. Based on this finding, the Federal Circuit indicated that it was "satisfied that the plaintiffs met their jurisdictional burden before the Court of Federal Claims on the basis of the justifiable uncertainty of the permanence of the taking caused by the actual mitigation efforts of the Corps." *Id*. at 1310.

Finding *Banks* apposite, this court likewise concludes that plaintiff's takings case here is not time-barred. In his affidavit and brief, plaintiff asserts that the continuing remediation efforts of the Corps left him "justifiably uncertain" as to whether problems with the navigation of the river appurtenant to his property would be solved. Defendant does not contest that such remediation efforts have occurred in the past and are ongoing. Rather, it asserts that plaintiff's affidavit, standing alone, is insufficient to raise a genuine issue of fact in this regard, citing *Litton Indus. Prods., Inc. v. Solid State Systems Corp*., 755 F.2d 158, 164 (Fed. Cir. 1985) for the proposition that "mere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment." However, the rule enunciated in *Litton* generally applies only in cases involving summary legal conclusions or conclusory statements involving the ultimate issue of fact. *See, e.g.*, *Applied Cos. v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998); *Imperial Tobacco Ltd. v. Philip Morris, Inc*., 899 F.2d 1575, 1581 (Fed. Cir. 1990); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 61 Fed. Cl. 175, 181-82 (2004). Such is not the case here. Although brief, plaintiff's affidavit does not consist of gauzy generalities, but rather recounts specific meetings that he attended involving mitigation efforts, providing details regarding, *inter alia*, the timing and content of those meetings. In the court's view, absent any contrary evidence, this affidavit is sufficient to support plaintiff's claim regarding the delay in the accrual of his takings claims. As a result, his claims are not time-barred. *See Becho Inc. v. United States*, 47 Fed. Cl. 595, 602-03 (2000).

**B. Tort v. Taking**

One of plaintiff's claims is that ordnance has migrated up the river and deposited on his property, thereby effectuating a physical taking of his property. Although plaintiff supports his factual assertions with an expert report and two affidavits, defendant contests that ordnance exists on his property. While, in the court's view, a genuine issue of material fact plainly exists on this factual point, a second related issue more arguably is ripe for summary judgment, *to wit*, whether the presence of such ordnance would give rise to a takings or a tort. This court, of course, lacks jurisdiction over the latter type of suit. 28 U.S.C. § 1491(a)(1); *see Alves v. United States*, 133 F.3d 1454, 1459 (Fed. Cir. 1998).

According to the Federal Circuit, to "show that treatment under takings law is appropriate," a plaintiff "must clear two hurdles." *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005); *see also Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355-56 (Fed. Cir. 2002). "First," that court has stated, "a property loss compensable as a taking only results when

the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" *Ridge Line*, 346 F.3d at 1355 (quoting *Columbia Basin Orchard v. United States*, 132 F.Supp. 707, 709 (Ct. Cl. 1955)); *see also Moden*, 404 F.3d at 1342; *Owen v. United States*, 851 F.2d 1404, 1418 (Fed. Cir. 1988) (en banc). "Second, the nature and magnitude of the government action must be considered." *Ridge Line*, 346 F.3d at 1356. Thus, "[e]ven where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id.*; *see also Moden*, 404 F.3d at 1342; *Drury v. United States*, 52 Fed. Cl. 402, 403-04 (2002); *BMR Gold Corp. v. United States*, 41 Fed. Cl. 277, 282 (1998). Both hurdles must be faulted – *a fortiori*, if an injury does not result from an intentional invasion or is not predictable, but incidental or consequential, that alone can lead to the conclusion that a given action involves a tort, over which this court lacks jurisdiction.

Plaintiff does not seriously contend that the United States intended to invade his property by depositing the ordnance there – and the record on summary judgment would not support such a claim.[1] Rather, the focus here is whether the invasion of plaintiff's property was the "direct, natural, or probable result of an authorized activity." Recently, in *Moden*, *supra*, the Federal Circuit concluded that the latter phrase incorporates two causation components – cause-in-fact and foreseeability. 404 F.3d at 1343. To meet the first requirement, the authorized government act, quite simply, must have caused the injury. *Id.*; *see also Pashley v. United States*, 156 F. Supp. 737, 738-39 (Ct. Cl. 1957). By comparison, to meet the more daunting foreseeability requirement, the plaintiff must "prove that the government should have predicted or foreseen the resulting injury." *Moden*, 404 F.3d at 1343 (citing cases); *see also Ridge Line*, 346 F.3d at 1356 (the alleged injury must be "the predictable result of the government action"). To survive defendant's motion for summary judgment, then, plaintiff must point to some evidence presenting a genuine issue of material fact with regard to whether the depositing of ordnance on his property was caused by the government conduct and the "foreseeable or predictable result" thereof.

In the case *sub judice*, plaintiff avers that the asserted invasion of his property was the natural foreseeable and predictable result of authorized activity, namely, the approval of the revetments on the lake. More specifically, plaintiff contends that the Army Corps should have known that with thousands of rounds of ordnance having been shot into the former artillery test firing zone located in Lake Erie just offshore from the mouth of the Toussaint River, shifting the

---

[1] Although at one point in his brief plaintiff indicates that he "does not assert that there was an intent to invade his private property interest," at another point he contends that "in 1995, the U.S. Army Corps of Engineers dumped ordnance on Plaintiff's property and in close proximity to Plaintiff's property." Unlike his other claims, the latter assertion is not supported by affidavit or other evidence, and, accordingly, does not give rise to a genuine issue of material fact. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984) (stating that more is required than mere assertions of counsel to defeat a motion for summary judgment).

wave action of the lake by allowing the revetments to be built could cause some of the ordnance to migrate upstream either by wave action or ice flow. In support of these claims, plaintiff has filed two affidavits, in which he and one of his employees state that they have observed ordnance in the water and on ice flows near plaintiff's property. In addition, plaintiff has filed an expert report, which describes the estuarine nature of the Toussaint River, asserting, contrary to defendant's claims, that "[f]low in the estuary can be either upstream or downstream depending on fluctuations in the level of Lake Erie and the direction of the wind." The report also notes that unexploded ordnance has been encountered upstream from the lake, thereby supporting plaintiff's claim that ordnance somehow migrated from the lake to his property, approximately 1.5 miles upstream. Moreover, in its citation of various scientific principles, the report can reasonably be construed as asserting that the Corps of Engineers and other responsible agencies should have recognized that allowing the revetments to be built would impact the flow of the Toussaint River and cause the migration of ordnance.

While defendant contests these assertions with reports of its own, including several by the Corps of Engineers, those documents only serve to create – not eliminate – a genuine issue of material fact as to how the ordnance, if it does exist on plaintiff's property, came to be there. In this regard, it is important to note that the issue here is not whether the migration was foreseen, but ***foreseeable***. Defendant's objections to plaintiff's evidence do not obviate the necessity for a fuller factual inquiry regarding this issue. *See* 10A Charles Alan Wright, Arthur R. Miller & May Kay Kane, Federal Practice & Procedure § 2727 (2005) (facts asserted by the nonmovant, "if supported by affidavits or other evidentiary material," are to be regarded as true for purposes of the motion) (citing cases). Likewise, it appears that there is at least a genuine issue of material fact as to whether the alleged presence of ordnance "preempt[ed] the owners right to enjoy his property for an extended period of time." *Ridge Line*, 346 F.3d at 1356. In short, in the court's view, plaintiff has presented evidence sufficient to create a genuine issue of material fact as to this count of his complaint, thereby requiring the court to deny defendant's motion as it relates thereto. Pending the receipt of further evidence at trial, the court reserves the question whether the actions of which plaintiff complains actually gave rise to a tort, rather than a physical takings.

### C. Property Interests.

Unlike his physical takings claim, plaintiff's regulatory takings claim focuses on the impact on his private property rights of the presence of ordnance and other obstructions at the mouth of the Toussaint River. Notably, plaintiff describes the property interest impacted by the alleged regulatory takings as his interest, as an upstream riparian owner, in "maintaining navigability" – he does not allege that there has been a regulatory taking of the marina and campground property itself. Defendant argues that plaintiff's regulatory takings claim fails, as a matter of law, because "Ohio law does not provide an individual property right to navigability of downstream waters," and that in the absence of such a state-law property right, plaintiff cannot raise a cognizable claim for just compensation.

In order to prevail on his claim under the Fifth Amendment, plaintiff must establish that he had a property interest that was effected by the alleged takings. *See Karuk Tribe v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941 (2001) (stating that under

takings analysis, "[f]irst, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action"); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1580 (Fed. Cir. 1993), *cert. denied*, 516 U.S. 870 (1995) (citing *United States ex rel. Tennessee Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943)). Whether plaintiff's asserted interest qualified as "private property" protected by the Fifth Amendment is ultimately a question of federal constitutional law. *Powelson*, 319 U.S. at 279. However, "[b]ecause the Constitution protects rather than creates property interests," *Phillips v. Wash. Legal Foundation*, 524 U.S. 156, 164 (1998), "property," for purposes of the Fifth Amendment's Takings Clause, is defined by law independent of the Fifth Amendment. Thus, it has been said that "[t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment," which interests instead are defined by "'existing rules or understandings' and 'background principles' derived from an independent source, such as state, federal, or common law." *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1030 (1992)); *see also Palazzola v. Rhode Island*, 533 U.S. 606, 626-28 (2001); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *Hansen v. United States*, 65 Fed. Cl. 76, 123 (2005). Under these principles, it is axiomatic that "not all economic interests are 'property rights'; only those economic advantages are 'rights' which have the law back of them." *United States v. Willow River Power Co.*, 324 U.S. 499, 502 (1945); *see also Klamath Irrig. Dist. v. United States*, 2005 WL 2100579 (Fed. Cl. 2005); Thomas W. Merrill, "The Landscape of Constitutional Property," 86 Va. L. Rev. 885, 970-81 (2000).

As stated, the question *sub judice* is whether plaintiff has a "private property" right in maintaining the navigability of the waters of the Toussaint River, which connect his marina to the lake. The parties agree that this issue is controlled by Ohio law. And, under that law, it appears that plaintiff does not possess a private property interest in navigability. Such was the holding of the Ohio Supreme Court in *State v. Masheter*, 203 N.E.2d 325 (Ohio 1964), which involved the owner of a marine terminal who sued when the construction of a low-lying bridge prevented certain grain ships from passing to his business. In rejecting the owner's claim to compensation under the Ohio Constitution – which like the Fifth Amendment, requires that compensation be paid for the taking of a "private property" interest, *see* §9, Art. I, § 19, Ohio Constitution – the Ohio Supreme Court found that no "private property has been appropriated by the [S]tate" in building the bridge. *Id.* at 328. In this regard, it explained:

> Every riparian owner has the right of ingress or egress between his land and the water. In addition, as a member of the public, he has the right to travel on Navigable streams. It is important to distinguish these rights. The right to go from his land to the river and from the river to his land is a private property right of the riparian owner. Navigation on public waters is exclusively a public right. Everyone has an equal right to the use of the water for travel and transportation. Although relator may have more occasions to make use of the right to unimpeded navigation and its land may be more damaged by the loss of that right, the right itself is still public and not private. Its ownership of land on the rivers gives it no greater right to navigate it. Every other citizen has the same right.

*Id*. at 327.[2] The court concluded that while the relator had "lost its right to navigate the public waters," there was "no appropriation of any private right of relator," and "[t]hus, . . . no taking of private property within the meaning of Section 19, Article I of the Constitution." *Id*. at 328.

In so ruling, the Ohio court distinguished the principal case upon which plaintiff relies herein, *Hickock v. Hine*, 23 Ohio St. 523 (1872). In that case, which primarily involved a standing issue, the Ohio Supreme Court found that a riparian owner, with a landing and warehouse, could enjoin an unauthorized obstruction to navigation. The *Masheter* court viewed *Hickock* as involving an injunction against a nuisance, thereby requiring the latter court to focus on whether the riparian owner's landing and warehouse were damaged by the nuisance and not on whether the same owner possessed a private property right in navigation. *Masheter*, 203 N.E. 2d at 327-28. Noting that the Ohio Constitution, unlike some state constitutions, affords a right of compensation only where there is a "taking" of "private property," the Ohio Supreme Court concluded that "[i]f there has been no taking of a person's private property, it is not enough to require compensation that the devotion of other land to a public use damages his property in a manner that would be actionable at common law if it were done by a private individual." *Id*. at 328. "[C]ases granting an injunction against an obstruction of navigation which constitute a nuisance," the court concluded, "are not authority for requiring compensation by the government for a similar obstruction authorized by the state." *Id*. Reiterating its primary holding, the court stated that "[w]here the construction of a bridge across a navigable stream is properly authorized, riparian owners who have access to the navigable part of the stream but who are cut off from navigation to and from the outside world have no constitutional right to compensation." *Id*.

In support of this conclusion, the Ohio Supreme Court cited opinions from two other jurisdictions. *See Carmazi v. Bd. of Cty. Comm'r of Dage Cty*., 108 So. 2d 318, 322 (Fla. App. 1959) ("Riparian owners acquire no additional rights to navigation other than those shared concurrently with the public."); *Marine Air Ways, Inc. v. State*, 104 NY.S.2d 964, 967 (N.Y. Ct. Cl. 1951) ("Where there is a lawful interference with navigation, a member of the public has no right to compensation therefor, and the owner of land abutting the water is not in a better position to claim compensation so long as his right of access is not denied him."). These, in fact, are but a few of the cases that have held that a riparian owner owns no compensable right to maintain the

---

[2] Under a long-standing principle of Ohio law, only the syllabus of an Ohio Supreme Court opinion states the controlling point or points of law for the case. Rule 1(B), Supreme Court of Ohio Rules for the Reporting of Opinions (West 2005); *see also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 751-52 (1995); *Perkins v. Benguet Min. Co.*, 342 U.S. 437, 442 n. 3 (1952) (recognizing the practice). Nonetheless, the opinion accompanying the syllabus provides useful guidance on interpreting the syllabus. *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 566 (1977) ("we are permitted to consult [the opinion] for understanding of the syllabus"); *LSI Indus., Inc. v. Hubbell Lighting , Inc.*, 232 F.3d 1369, 1372 n.3 (Fed. Cir. 2000); *Hostetler v. Consol. Rail Corp.*, 123 F.3d 387, 391 (6th Cir. 1997) ("Although the Ohio Supreme Court lays down the law through the syllabus, we may look to the body of the opinion for explication of that syllabus law.").

navigability between his property and other desirable locations, beyond that held by the public in general. *See, e.g., State ex rel. Anderson v. Preston*, 207 N.E. 2d 664, 666-67 (Ohio App. 1963) (construction of low-level bridge did not effectuate taking of upper riparian owner's private property rights); *Brackett v. Comm*. 223 Mass. 119, 123 (Mass. 1916) (no constitutional right for compensation based upon loss of navigability); *Milwaukee Western Fuel Co. v. City of Milwaukee*, 139 N.W. 540, 543 (Wis. 1913) ("a navigable stream is as much a public highway as a street, and no private rights can be acquired therein by its user as such"); *Frost v. Washington Co. R. Co.*, 51 A. 806, 809 (Me. 1901) (no compensation where "[t]he only right of the plaintiff interfered with . . . was his right of navigation by water in and out of the cove through the channel," which "right was the right of the public . . . and not for any particular individual"); *Whitehead v. Jessup*, 53 F. 707 (C.C. N.Y. 1893); *O'Brien v. Norwich & W.R. Co.,* 17. Conn. 372 (Conn. 1845) (no recovery where plaintiff "will be merely deprived of the enjoyment of a right to navigable public waters common to him and all others"); *see also* 2 Julius L. Sackman, Nichols on Eminent Domain § 505[1][a] (2005) (describing similar cases). In the end, although Ohio Supreme Court's opinion in *Masheter*, *supra,* all but resolves the property question presented, it appears, nonetheless, that opinion is well-grounded in logic and precedent.

Accordingly, under Ohio law, plaintiff does not have a private property right in maintaining the navigability of the Toussaint River. Consequently, his regulatory takings claim based upon the existence of that right must be dismissed.

## III. CONCLUSION

Based on the foregoing, the court **GRANTS**, **in part**, and **DENIES**, **in part**, defendant's motion for summary judgment. The court will conduct trial on the issues remaining in this case. On or before October 14, 2005, the parties shall file a joint status report proposing a schedule for pretrial filings and trial in this matter. Prior to this filing, the parties shall conduct at least one additional round of settlement discussions.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge