IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| KENT D. FLORO, | ) | No. 01-538 L |
| Plaintiff, | ) | Judge Francis M. Allegra |
| vs. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiff Kent D. Floro, by and through his attorney, Thomas A. Sobecki, pursuant to the Order filed March 6, 2006 and RCFC, Appendix A, paragraph 14(a) , submits his Memorandum of Contentions of Fact and Law as follows:.

## I. STATEMENT OF FACTS

### A. General Factual Contentions

Plaintiff expects to prove that for many years, he successfully and profitably owned and operated a marina and campgrounds on the Toussaint River, which empties into Lake Erie near the Erie Proving Grounds and Camp Perry Military Reservation. The combined effect of two

separate actions by Defendant, the United States, caused a change in conditions which led to the near-destruction of Plaintiff's business.

First, in the 1980s, the U.S. Army Corps of Engineers gave permission to the owner and operator of the Davis-Besse Nuclear Power Plant to construct a revetment/retaining wall along the shores of Lake Erie. The revetment/retaining wall was subsequently built. It affected the flow of the Toussaint River into Lake Erie, and caused a decrease in the volume and flow of water that the river needs to flush itself. As a result, a substantial sand buildup has occurred at the mouth of the river, adversely affecting navigability of the river.

Secondly, for many years, during military training exercises, live ordinance was dropped into Lake Erie adjacent to the Erie Proving Grounds and Camp Perry Military Reservation, near the mouth of the Toussaint River. Live ordinance was also dropped in the river itself. There is considerable live ordnance in the lake and adjacent waters that has never exploded but may explode in the future. The revetment/retaining wall has caused live ordnance to be carried to the mouth of the Toussaint River, and even to be carried up the river to Plaintiff's property. Several times the U.S. Army Corps of Engineers has authorized dredging operations at the mouth of the river, due to the sand buildup. However, the dredging operations have caused even greater movement of the live ordnance that is in the water. Dredging operations also failed to keep the mouth of the river open. Additionally, the U.S. Army Corps of Engineers dumped ordnance on Plaintiff's property and in close proximity to Plaintiff's property.

As a result of the above-described change in the conditions to the Toussaint River, Plaintiff's once-thriving business has been destroyed, and the value of Plaintiff's property has greatly diminished. Plaintiff has asserted that both actions of the government constitute a taking

of Plaintiff's property. However, this court has ruled that only the presence of live ammunition on Plaintiff's property, and not the buildup of sand at the mouth of the river, constitutes a taking of Plaintiff's property.

Because the court has ruled that the buildup of sand at the month of the river and the resulting loss of navigability of the river will not support a cause of action against the government, only those facts and issues relating to the presence of potentially live ammunition on Plaintiff's property will be further discussed in this statement. However, the presence of potentially live ammunition on Plaintiff's property results in part from the same governmental actions that have led to shoaling at the mouth of the river. Therefore it will, to a certain degree, be necessary to discuss those actions.

**B. Effect of the Revetment/Retaining Wall**

Two studies, one published in 1962 and the other in 1972, concluded that Locust Point, comprising the lower two miles of the river, its mouth, and the adjacent beach and near shore areas to the northwest and southeast of the mouth, had one of the most stable beaches along the Ohio shore. Both of the studies were conducted prior to the shore construction initiated for Davis-Besse. Subsequently, however, the U.S. Army Corps of Engineers granted permits to Toledo Edison to construct stone riprap revetment on Locust Point (permit No. 73-001-123 issued September 10, 1973) and to construct two reaches of clay dike and stone riprap revetment along the shoreline at Davis-Besse Nuclear Power Station (permit No. 87-479-74 issued November 25, 1987).

In a report by Dr. Charles E. Herdendorf, Ph.D., a geologist with postgraduate studies in coastal engineering and oceanography, Dr. Herdendorf describes a "natural overwash process"

which occurred prior to the construction of the riprap dike/revetment system, which absorbed much of the shoreward migrating sand that was mobilized by wave action and grounded ice flows. With the barrier of the revetment in place the incoming sand was deflected southeastward along the coast expanding the sand bars and spit at the Toussaint River mouth. Unfortunately, the Corps failed to consider the impact of eliminating the natural overwash process in the marshland which absorbed shoreward migrating sand and kept it from blocking the Toussaint River mouth. The elimination of the natural sand storage reservoir in the marshland's Locust Point has led to the deposition of sand in the channel at the Toussaint River mouth and a hazardous navigation system.

Additionally, when the perimeter dike system around Davis-Besse was extended to the North shore of the Toussaint River estuary in the late 1980s, a linear mile of marshland was precluded from functioning as part of the estuarine-coastal wetlands system. About 17 percent of the total service area of the estuary was removed from the system. Before the riprap dike was constructed along the north shore, the wetlands there served as a reservoir to absorb water rushing into the estuary during periods of rising water levels in the lake. Once the lake level receded, the water from this wetlands reservoir was released to flow through the restricted channel and thereby flush the channel and keep the mouth open for navigation. With the loss of this reservoir, the flushing action was reduced and siltation/sandbar formation became a problem at the river mouth.

The problems of navigational impediment and unexploded ordnance at the mouth of the river are linked. The same forces that continually replenish sand and gravel to the Locust Point beach, namely wave action and ice action, bring the ordnance ashore from the Firing Range

Impact Area. Littoral forces carry these materials to the mouth of the Toussaint River and into the river itself. A review of aerial photographs and NOAA charts shows that the extensive series of sand bars and spits started to form only after the Davis-Besse nuclear power station dike/revetment system was constructed along the Locust Point beach. The armored shoreline created by this construction is now largely devoid of beach and the former beach material, along with ordnance, has been deflected to the southeast and into the Toussaint River mouth. Prior to the dike/revetment construction, the marshlands behind the beach absorbed much of the excess shoreward migrating sand. Also, the loss of significant flushing action in the estuarine portion of the lower Toussaint River as a consequence of the dike along the north shore has robbed the river of the forces necessary to naturally keep the mouth channel open.

**C. Presence/Effect of Live Ordnance**

Live ordnance has been fired into the Lake Erie Impact Area since early in the 20th century. Some of this ordnance has made its way into the Toussaint River and into the waters adjacent to and inside the Floro Marina. Plaintiff, Kent Floro, has personally observed ordnance in the water adjacent to his property and in the Floro Marina. Additionally, he has personally observed ordnance on ice floes in the mouth of the Toussaint River and on the river close to the marina.

Plaintiff's employee, Christopher Moore, has also personally observed ordnance in the water adjacent to and in the Floro Marina, and on ice floes in the mouth of the river. Additionally, at a time which he believes to be two or three years after Corps personnel tested certain instrumentation in Floro Marina, uniformed Army personnel came unannounced onto the Marina property and, after asking questions of him, evacuated the area, ordering everyone off the

site. When Moore asked what was going on, he was told that it was none of his business and that he should immediately leave. Before he left the site, he observed personnel in the vicinity where the Corps personnel had always docked their boat, removing what appeared to be ordnance from the river, taking it to a truck or van.

In 1992, a cleanup of the beach area southeast of the Toussaint River mouth resulted in the removal of 5438 ordnance items, with about 1/4 of these items being live (unexploded). Additional live artillery shells were uncovered during dredging operations in 1995. A 2001 report by the U.S. Army Engineer District, Buffalo, stated, "Since ordnance has been encountered within the channel during past dredging activities, it is prudent to assume that it will be in the future."

On July 18, 2002, Dr. Herdendorf conducted an investigation of the site. Among his activities, he conducted a brief informal survey consisting of wading in the water a short distance out from the shore. The brief survey uncovered more than 50 pieces of ordnance, over half of which were suspected of being unexploded. As noted above, the problems of navigational impediment and unexploded ordnance at the mouth of the river are linked. The same forces that continually replenish sand and gravel to the Locust Point beach, namely wave action and ice action, bring the ordnance ashore from the Firing Range Impact Area.

**D. Diminishment of Value of Plaintiff's Property**

Thomas Kitz, an appraiser licensed in both Michigan and Ohio, and who has significant experience in the valuing of marinas, appraised the subject property. Plaintiff has previously submitted Mr. Kitz' self-contained appraisal report. Although the marina was closed at the time of the appraisal, in preparing the report Mr. Kitz formed an opinion of value as if it were presently operating as a viable business concern, and also formed an opinion of the "as is" value, effective October 1, 2004.

The opinion of value of the property as an ongoing marina business was prepared under the hypothetical condition that the Toussaint River was open to navigation, unimpeded by shoaling at the mouth, and the absence of unexploded United States ordnance located in the river and the marina.

Although the Floro Marina at one time had the capacity to accommodate up to 235 slips, prior to closing of the basin it operated with approximately 150 boat slips. The number and configuration of the slips was adjusted based on demand for certain sizes. In the analysis, the marina was calculated to be built over 11.48 acres situated on the south side of the Toussaint River, about one half mile west of the convergence of the river with Lake Erie.

Based on an independent investigation and study of the various data and factors related to value, Mr. Kitz has formed the opinion that the market value of the fee simple property rights, under the hypothetical condition defined above, as of the effective date of appraisal, would be approximately $425,000.

Because of the change in conditions, use of the property as a marina is no longer financially feasible. Consequently, the highest and best use of the property has changed. In the

opinion of Mr. Kitz, the "as is" market value of the property, available for its highest and best use, is $160,000.

Thus loss of fair market value for the property, being the difference between its value as an ongoing marina business and its "as is" market value, is $265,000.

## II. STATEMENT OF ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

1. Whether the actions of Defendant have in fact caused safety problems affecting the viability of the Floro property as a marina, and hence affecting the fair market value of the property.

2. Whether, assuming Defendant's actions have in fact caused safety problems affecting the viability of the Floro property as a marina, and hence affecting the fair market value of the property, Defendant's actions constitute a taking under the Fifth Amendment.

3. Assuming Defendant's actions constitute a taking under the Fifth Amendment, what is the measure of damages?

## III. LEGAL PRINCIPLES

The takings claim advanced by Plaintiff alleges that through the act of permitting Toledo Edison to build dikes and revetments/retaining walls, resulting in a change to the natural flow of the Toussaint River, combined with the act of firing live ammunition into Lake Erie, which in some cases may have been actually fired in the Toussaint River and its vicinity, the government has caused some of the ammunition to migrate onto Plaintiff's property. The effect of this action has been to diminish the value of Plaintiff's property.

If this court determines that a taking has occurred, it must determine damages. The proper measure of just compensation in a takings case is fair market value." ***Kirby Forest Industries Inc. v. United States*** (1984) 467 U.S. 1, 9-10; ***United States v. General Motors Corp.*** (1945), 323 U.S. 373. "[T]he fair market value of property under the Fifth Amendment can include an assessment of the property's capacity to produce future income if a reasonable buyer would consider that capacity in negotiating a fair price for the property." ***Yancey v. U.S.***, 915 F.2d 1534, 1542 (Fed.Cir.1990), citing ***Yachts America v. United States***, 779 F.2d 656, 660 (Fed.Cir.1985), *cert. denied*, 479 U.S. 832, 107 S.Ct. 122, 93 L.Ed.2d 68 (1986).

The Supreme Court has stated that "just compensation" is "the full monetary equivalent of the property taken," and that "[t]he owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." ***Almota Farmers Elevator & Whse. Co. v. United States***, 409 U.S. 470, 473-74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). This "monetary equivalent" has often been derived via formulae that incorporate the concept of fair market value. That value is what a willing buyer would pay in cash to a willing seller, neither being under any compulsion to buy or sell and both being fully informed and knowledgeable about all relevant matters. ***United States v. Virginia Electric & Power Co.*** (1961), 365 U.S. 624, 633, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); ***United States v. Miller*** (1943), 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336. And since a hypothetical buyer could look to both existing and potential uses for the property, fair market value takes into consideration "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future ... to the full extent that the prospect of demand for such use affects the market value while the

property is privately held." ***Washington Metropolitan Area Transit Authority v. U.S.***, 54 Fed. Cl. 20, 27 (Fed.Cl.2002).

**IV. CONCLUSION**

At trial, Plaintiff intends to prove that live or potentially live ordnance has invaded Plaintiff's property as a result of the actions of the government, and that the presence of that ordnance has caused a loss of fair market value of his property.

Respectfully submitted,

/s/ Thomas A. Sobecki

______________________________

Thomas A. Sobecki (0005210)
520 Madison Ave., Suite 811
Toledo, OH 43604
Telephone: 419-242-9908
Fax: 419-242-9937
E-mail:tsobecki@tomsobecki.com

Attorney for Plaintiff Kent D. Floro

**PROOF OF SERVICE**

I certify that a copy of the foregoing Revised Memorandum of Contentions of Fact and Law was served on opposing counsel by the Court's electronic filing and notification system, this 1st day of June 2006.

/s/ Thomas A. Sobecki

______________________________

Thomas A. Sobecki